Phyllis FAIRCLOTH, Administratix of the Estate of Jiles T. Lynch, Plaintiff-Appellee,

v.

Herman FINESOD, Defendant-Appellant,

and

Jackie Fine Arts, Inc.; F. Peter Rose; L.A. Walker; C.S. Pulkinen; National Settlement Associates of South Carolina, Inc.; Marilyn Goldberg; Marigold Enterprises, Ltd.; Sigmund Rothschild, Defendants.

No. 89–2788.

United States Court of Appeals, Fourth Circuit.

Argued Feb. 4, 1991.

Decided July 9, 1991.

Before HALL, Circuit Judge, BUTZNER, Senior Circuit Judge, and MULLEN, District Judge for the Western District of North Carolina, sitting by designation.

K.K. HALL, Circuit Judge:

Herman Finesod appeals a judgment in excess of $4.3 million for fraud, civil conspiracy, and RICO, entered against him after a jury trial. Finesod did not appear at the trial. Nonetheless, we find that a pretrial error requires a reversal in part.

## I.

This case arises from a tax avoidance scheme. Appellant Herman Finesod is a promoter of tax shelters. In late 1979, a Finesod-controlled company, Jackie Fine Arts, Inc.,[1] sold Jiles Lynch a Picasso "art master." An "art master" is a copy of a famous painting from which prints, posters, and the like can be made. Along with the picture, Lynch bought the rights to make various kinds of reproductions from it. For his Picasso art master, Lynch paid $100,000 down and gave a note for an additional $450,000. This note was not due until 1994. Jackie Fine Arts sold over 2,000 other art masters to other investors, at an average price of $225,000–$250,000. In 1986, Jackie Fine Arts was holding $409 million in notes receivable from buyers of art masters.

The art masters are actually worth only a tiny fraction of the prices paid by investors; Jackie Fine Arts paid about $10,000 apiece for them. However, Jackie furnished investors with two supposedly independent appraisals of each art master. Lynch's Picasso master was pegged at $750,000 by Sigmund Rothschild and $700,000 by F. Peter Rose. Rothschild and Rose worked out of the same office and used the same secretary, though this arrangement was not disclosed to investors. The two churned out around 2,500 appraisals for Jackie Fine Arts, all of them in the same

Elliot Silverman, argued (William B. Wachtel, on brief), Gold & Wachtel, New York City for defendant-appellant.

John Patrick Freeman, Columbia, S.C., for plaintiff-appellee.

---

1. Jackie Fine Arts, Inc., is wholly owned by M & J Holding Corporation, a company owned by Finesod. M & J's 1986 tax return showed assets of $1.33 billion.

basic format. Rothschild was paid $250 per appraisal, Rose $150–$300 each, and Rose kicked back $50 per appraisal to Rothschild.

A similarly tainted opinion was provided about the tax consequences of an art master purchase. A Los Angeles law firm wrote an opinion letter supporting the viability of the tax shelter. This firm, however, had a secret deal with Finesod through which it received 1% of the cash received from the sale of the masters, and it had represented a Finesod-controlled entity in previous shady dealings.[2]

The IRS has disallowed use of the art masters as tax shelters, and numerous suits have arisen nationwide.

The key event relevant to this appeal occurred February 22, 1985, when Jiles Lynch died. Phyllis Faircloth, his administratrix, filed this suit on July 5, 1985, against Jackie Fine Arts, Finesod, Rothschild, Rose, and others. Faircloth asserted claims for fraud, violations of various securities laws, unfair trade practices, and RICO.[3] The defendants moved for summary judgment and alleged that the fraud and RICO claims did not survive the death of Lynch. The district court, in a reported opinion, held that civil RICO claims do survive. *Faircloth v. Jackie Fine Arts, Inc.,* 682 F.Supp. 837 (D.S.C.1988). Furthermore, the court ruled that, although the South Carolina survival statute as interpreted by that state's courts would not permit a fraud action to survive, the statute violated the Equal Protection Clause of the Fourteenth Amendment.[4] Therefore, the district court denied the defendants' motion for summary judgment on the fraud and RICO claims.

After nearly four years of litigation, Finesod's counsel moved to withdraw, and the district court granted the motion on March 10, 1989. Four months later, the case proceeded to trial against the three remaining pro se defendants—Finesod, Rose, and Jackie Fine Arts. None of the defendants appeared.

At the close of the evidence, the district court directed a verdict for the plaintiff against all three defendants. The jury deliberated only as to what, if any, punitive damages were appropriate. The awards were considerable. Faircloth was awarded $469,839 compensatory damages for fraud and civil conspiracy[5] and $1,409,517 treble damages on the RICO claim (three times

---

**2.** Finesod had earlier marketed the "Hambrose Stamp" tax shelter, which was similar to the art master scam, except that it dealt in rare postage stamps, instead of paintings.

**3.** By the time the case went to trial, Faircloth had amended her complaint twice. The final version contains only two counts: civil RICO and commonlaw fraud. She also now alleges that her complaint also asserts a claim for common-law "civil conspiracy." *See* notes 5 and 10 *infra.*

**4.** In addition, the court held that the art master was not a "security" and that actions under the state Unfair Trade Practices Act do not survive the victim; accordingly, the defendants were granted summary judgment on those claims. The plaintiff raised an equal protection challenge to the non-survivability of the unfair trade practices claim, which was side-stepped: "Inasmuch as the court finds that the SCUTPA cause of action does not survive because of the express language of that statute, the court will not address the constitutionality of the survival statute at this time." 682 F.Supp. at 845. Faircloth has not appealed the summary judgment entered against her on that claim, and the district court's ruling is therefore not before this court.

**5.** The rules of notice pleading are properly lenient, but we cannot charge Finesod with notice of a "civil conspiracy" claim from the final amended complaint. The elements of a civil conspiracy claim are buried in paragraph 66 of the RICO count, but it is not pled as a separate cause of action. We do not think it asks too much of the drafter of a voluminous, complex complaint to list his claims. A defendant should not be required to comb the complaint for combinations of elements that could constitute some tort other than those identified by the plaintiff. Even if Finesod recognized the elements of "civil conspiracy," the manner in which it was "pled" in the final complaint could have reasonably led him to believe that Faircloth alleged "civil conspiracy" as a RICO theory rather than a full-fledged common-law cause of action. Moreover, it is quite debatable as a matter of South Carolina law whether civil conspiracy recovery is available where the only tortious acts alleged are pled as separate claims. Compare *Todd v. South Carolina Farm Bureau Mutual Insurance Co.,* 276 S.C. 284, 278 S.E.2d 607 (1981), with *LaMotte v. Punch Line of Columbia, Inc.,* 296 S.C. 66, 370 S.E.2d 711 (1988).

the same $469,839). The jury assessed punitive damages of $5 million against Jackie Fine Arts, $2.5 million against Finesod, and $500,000 against Rose. The court permanently enjoined the defendants from trying to collect on the $450,000 promissory note when it matured. Finally, the plaintiff was awarded attorney's fees of $615,170.

Finesod filed a timely pro se notice of appeal, but Rose and Jackie Fine Arts did not. After we calendared the case for argument, Finesod retained counsel to prosecute the appeal.

## II.

The central issue presented, and that of most importance to the bench and bar of South Carolina, is the constitutionality of the survival statute. At common law, tort claims did not survive the death of the plaintiff or defendant. In 1932, the South Carolina legislature repudiated the old rule and enacted a liberal survival statute (codified at S.C.Code § 15-5-90):

> Causes of action for and in respect to any and all injuries and trespasses to and upon real estate and any and all injuries to the person or to personal property shall survive both to and against the personal or real representative, as the case may be, of a deceased person and the legal representative of an insolvent person or a defunct or insolvent corporation, any law or rule to the contrary notwithstanding.

Though this language is broad, the South Carolina Supreme Court has persisted in recognizing an exception to survivability for claims of slander, malicious prosecution, and fraud. *Mattison v. Palmetto State Life Insurance Co.*, 197 S.C. 256, 15 S.E.2d 117 (1941). There is no question that Faircloth's fraud claim is barred if the South Carolina statute is constitutional.

The district court held otherwise, however. The court found that the statute, as interpreted by the South Carolina courts, creates a distinction between two classes of

plaintiffs that, at least as regards a fraud claim,[6] is not rationally related to a legitimate government objective. Therefore, the court concluded that the statute violates the Equal Protection Clause.

There are few cases addressing the constitutionality of exceptions for particular torts from a survival statute. Other than the district court's opinion in this case, there are only four reported cases on point, all from state courts—*Nadstanek v. Trask*, 130 Or. 669, 281 P. 840 (1929) (exception for personal injury does not violate "fundamental law" of state); *Stanley v. Petherbridge*, 96 Colo. 293, 42 P.2d 609 (1935) (claim that has not been reduced to judgment is not such a vested right that legislature may not take it away), *overruled on other grounds, Publix Cab Co. v. Colorado National Bank of Denver*, 139 Colo. 205, 338 P.2d 702, 712 (1959); *Moyer v. Phillips*, 462 Pa. 395, 341 A.2d 441 (1975) (libel and slander exception violated Equal Protection Clause of state and federal constitutions); *Thompson v. Petroff's Estate*, 319 N.W.2d 400 (Minn.1982) (exception for all intentional torts violated state constitution's Equal Protection Clause). Though the first two challenges failed, and the more recent two have succeeded, these decisions are too few and scattered to say that there is either a trend or a prevailing view.

■ We are not concerned with whether a fraud exception to a general survival statute is a prudent legislative choice. Statutes are presumed constitutional, and a law that neither creates a suspect class nor abridges a fundamental right is given only minimal equal protection scrutiny. *City of New Orleans v. Dukes*, 427 U.S. 297, 303, 96 S.Ct. 2513, 2516, 49 L.Ed.2d 511 (1976). A court applying minimal scrutiny will not overturn a statute " 'unless the varying treatment of different groups or persons is so unrelated to the achievement of any combination of legitimate purposes that [the court] can only conclude that the legis-

---

6. Because there was no slander or malicious prosecution claim before it, the district court did not need to address the constitutionality of those exceptions to survival. The court did state, however, that the rationale for their nonsurvival "is a bit more obvious because those causes of action ostensibly protect the reputation of the plaintiff." 682 F.Supp. at 848.

lature's actions were irrational.' " *Pennell v. City of San Jose,* 485 U.S. 1, 14, 108 S.Ct. 849, 858, 99 L.Ed.2d 1 (1988), *quoting Vance v. Bradley,* 440 U.S. 93, 97, 99 S.Ct. 939, 942, 59 L.Ed.2d 171 (1979).[7]

█ We do not believe that the presumption of constitutionality has been overcome here. The district court relied heavily on the lack of an explanation of the exception's rationale by the South Carolina courts as evidence of the absence of any rationale. That conclusion does not necessarily follow. The South Carolina courts have simply construed the statute. The constitutionality of the statute has not been challenged before them; they have consequently had no cause to delve into its purpose. Immediately after referring to this silence, the district court continued: "This court refuses to speculate as to what considerations may underlie the distinction between fraud and other causes of action." 682 F.Supp. at 849. On the contrary, a court *must* make every feasible attempt to discern the reasons for a legislative distinction before it declares that distinction irrational and unconstitutional.

Appellant argues that the South Carolina legislature could have left the harsh common-law rule intact, and its decision to modify, rather than abolish, the rule should not render it constitutionally infirm. While this argument has some superficial appeal, it does not resolve the question before us. Even if the legislature acts in a wholly beneficent manner, it must do so constitutionally.

█ The "rational basis" for the distinction is the real issue, and the basis posited by appellant is enough. Appellant argues that fraud is a tort that requires a special quality of proof,[8] and the states of mind of the victim (*e.g.,* whether he knew the statement was false, relied upon it, and was justified in so relying) and the perpetrator are especially vital. Appellant asserts that a legislature could rationally conclude that the difficulty and potential unfairness of proving the state of mind of a dead party to a fraudulent transaction justified excepting fraud from the survival statute. In rebuttal, Faircloth points out that equitable rescission claims based on fraud do survive in South Carolina. *Page v. Lewis,* 203 S.C. 190, 26 S.E.2d 569 (1943). Faircloth's argument has some merit, though we think it rational to distinguish between a common-law fraud action (in which consequential and punitive damages are available) and a rescission claim based on fraud (where restoration of the status quo ante is the entire remedy), and to allow only the less expansive remedy where a party is dead.[9]

The South Carolina survival statute does not violate the Fourteenth Amendment's Equal Protection Clause. We therefore reverse the judgment on Faircloth's common-law claims.[10]

---

**7.** Though the district court did not misstate the equal protection test, the only case it cited, *Reed v. Reed,* 404 U.S. 71, 92 S.Ct. 251, 30 L.Ed.2d 225 (1971), involved a gender classification, which is subjected to a "heightened" scrutiny short of that reserved for suspect classes, but more critical than the minimal rationality required of innocuous classifications.

**8.** Echoing this potential "rational basis," Federal Rule of Civil Procedure 9(b) requires fraud to be pled more particularly than other claims.

**9.** Two other of Faircloth's arguments hold little water. She criticizes appellant's speculation, and asks for citations to legislative history. This argument misconstrues the burden of proof. Finesod is entitled to rely upon the presumption of constitutionality; the challenger to constitutionality—Faircloth—must establish that the purpose of the classification is not legitimate or that the classification does not rationally further a legitimate purpose. *New York State Club Ass'n, Inc. v. City of New York,* 487 U.S. 1, 108 S.Ct. 2225, 101 L.Ed.2d 1 (1988).

Faircloth also asserts that the statute itself does not create the fraud exception, and that the South Carolina courts have misinterpreted it. She misstates the role of a federal court in weighing the constitutionality of a state statute. This court is bound by the state court's interpretation, and must assume that the statute says what the state courts say it says. *Paine v. Baker,* 595 F.2d 197, 200 (4th Cir.), *cert. denied,* 444 U.S. 925, 100 S.Ct. 263, 62 L.Ed.2d 181 (1979).

**10.** To the extent the common-law judgment may rest on the defectively-pled civil conspiracy claim, it is reversed for the reasons stated in footnote 5 *supra.*

## III.

■ Finesod next asserts that a civil RICO action does not survive. There are no court of appeals decisions on this precise issue. The district courts that have addressed the matter, except the Northern District of Illinois, have concluded that civil RICO claims do survive. Few of these cases are officially reported. *State Farm Fire & Casualty Co. v. Estate of Caton,* 540 F.Supp. 673 (N.D.Ind.1982), *overruled on other grounds, Ashland Oil, Inc. v. Arnett,* 656 F.Supp. 950 (N.D.Ind.1987); *Costello v. Cooper,* No. 86–Civ.–3264, 1990 WL 9856 (S.D.N.Y. Jan. 31, 1990); *Republic Pension Services, Inc. v. Finger,* No. CV 87–0255, 1988 WL 22579 (E.D.N.Y. Feb. 11, 1988); *cf., In re National Mortgage Equity Corp. Mortgage Poll Certificates Securities Litigation,* 636 F.Supp. 1138, 1151–1156 (C.D.Cal.1986) (RICO claim assignable, citing *State Farm* with approval); *contra, Washburn v. Brown,* No. 81–C–1475 1988 WL 130021 (N.D.Ill. Nov. 25, 1988); *Eliasen v. Hamilton,* No. 81–C–123, 1987 WL 7815 (N.D.Ill. Mar. 9, 1987); *First Interstate Bank v. Chapman and Cutler,* No. 83–C–8583, 1986 WL 7346 (N.D.Ill. June 23, 1986); *First Interstate Bank v. National Republic Bank,* No. 80–C–6401, 1985 WL 1118 (N.D.Ill. Mar. 10, 1985). The basic federal rule is that an action for a penalty does not survive, *Schreiber v. Sharpless,* 110 U.S. 76, 80, 3 S.Ct. 423, 424, 28 L.Ed. 65 (1884), though remedial actions do. *United States v. Grannis,* 172 F.2d 507, 514 (4th Cir.), *cert. denied,* 337 U.S. 918, 69 S.Ct. 1160, 93 L.Ed. 1727 (1949).

Faircloth points out that Congress explicitly declared the purpose of RICO to be "remedial" and directed that it be "liberally construed" to effect this purpose. Pub. Law No. 91–452, tit. IX § 904(a), 84 Stat. 947, *reprinted* foll. 18 U.S.C. § 1961 note. On the other hand, we must take note that RICO contains criminal penalties, which cannot possibly be considered "remedial" notwithstanding this congressional label. Moreover, the treble damages available to civil RICO plaintiffs doubtless have incidental punitive as well as remedial effects.

■ In short, civil RICO is a square peg, and squeeze it as we may, it will never comfortably fit in the round holes of the remedy/penalty dichotomy. Nonetheless, we must fit it as best we can. Construing it liberally, as Congress directed, we think that civil RICO claims should survive. Certainly, the primary purpose of the private right of action created by RICO is remedial. *Shearson/American Express, Inc. v. McMahon,* 482 U.S. 220, 240–242, 107 S.Ct. 2332, 2344–2346, 96 L.Ed.2d 185 (1987) (Collecting legislative history that "emphasis" of RICO treble damages is "remedial.")

In addition, Faircloth makes a compelling logical argument—murder is a RICO predicate act, and it would certainly be anomolous if a cause of action based on death did not survive the death of the would-be plaintiff. We cannot conclude that Congress ignored the brutal history of organized crime by providing a defense to criminals who have the foresight to kill their victims.

We hold that civil RICO claims do not abate upon the death of the injured party. The RICO judgment is affirmed.[11]

## IV.

Finally, Finesod urges the court to review the damages award. He acknowledges that his failure to appear at trial limits the court's review to plain errors. *National Wildlife Federation v. Hanson,* 859 F.2d 313, 318 (4th Cir.1988).

■ He first argues that the same actual damages were awarded for the fraud claim, and then awarded again, trebled, for the RICO claim. In other words, Faircloth got quadrupled actual damages. This court has forbidden such stacking of RICO damages with damages for the predicate acts. *Morley v. Cohen,* 888 F.2d 1006 (4th Cir. 1989). In any event, because we reverse the state-law judgment, we need not decide whether this duplication of damages amounted to plain error.

---

**11.** Our affirmance includes the permanent injunction forbidding collection of the outstanding note, which was issued pursuant to the district court's authority under 18 U.S.C. § 1964(a).

Finesod's other attack on the damage award is not so strong as to amount to plain error. Finesod asserts that the income tax penalties and assessments incurred because of the disallowance of the tax shelter should not be included as an element of damage, because Lynch would have owed the money to the IRS anyway. Appellee responds that Finesod fraudulently promised to provide the tax savings, and Lynch's estate should get the benefit of the bargain. This issue is arguable enough that we will not disturb this part of the damages award without an objection below.

In short, we reverse the judgment below insofar as it awards compensatory and punitive damages for state-law fraud and civil conspiracy; in all other respects, the judgment is affirmed.

AFFIRMED IN PART AND RE-VERSED IN PART.